**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------X   Case No.
DEBORAH GREY,

                PLAINTIFF,   **COMPLAINT**

   - against -

                                          **PLAINTIFF DEMANDS**
VENGROFF WILLIAMS, INC. and SECOND LOOK,   **A TRIAL BY JURY**
INC.,

                DEFENDANT.
------------------------------------------------------------------------X

DEBORAH GREY ("Plaintiff"), by and through her attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, against VENGROFF WILLIAMS, INC. ("Vengroff Williams") and SECOND LOOK, INC. ("Second Look") (collectively "Defendants") alleges upon knowledge as to herself and her own actions and upon information and belief as to all other matters as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to the discrimination and retaliation provisions of **The Americans with Disabilities Act of 1990**, 42 U.S.C. § 12101, *et seq*. ("ADA") and **The Age Discrimination in Employment Act of 1967** § 4(a), 29 U.S.C. § 629, *et seq*. ("ADEA"), and seeks damages to redress the injuries Plaintiff has suffered as a result of being discriminated against and retaliated against by her employer on the basis of her **age (over forty) and/or perceived disability (COVID-19 and COVID-Pneumonia)** a long term illness and impairment which affects one or more of Plaintiff's major life activities.

## JURISDICTION AND VENUE

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, as this action arises under 42 U.S.C. §12101, *et seq*.

3. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the actions or omissions giving rise to the claims for relief occurred within this judicial district.

## PROCEDURAL PREREQUISITES

4. PLAINTIFF timely filed a complaint, upon which this Complaint is based, with the United States Equal Employment Opportunity Commission ("EEOC").

5. PLAINTIFF received a Notice of Right to Sue from the EEOC, dated July 18, 2022, with respect to the instant charges of discrimination. A copy of the Notice is annexed to this Complaint.

6. This action is being commenced within 90 days of receipt of the Notice of Right to Sue.

## PARTIES

7. At all times material, Plaintiff, a woman over the age of forty (40), was a resident of the State of North Carolina.

8. At all times material, Plaintiff was and is a "person" and "employee" entitled to protection as defined by the ADA and ADEA.

9. At all times material, Vengroff Williams is a foreign business corporation incorporated under the laws of the State of Florida, with a primary place of business at 2211 Fruitville Road, Sarasota, Florida 34237.

10. At all times material, Second Look is a domestic business corporation with a primary place of business at 360 Motor Parkway, Suite 500, Hauppauge, New York 11788.

11. At all times material, Defendants, collectively and separately, employed twenty (20) or more employees and are therefore "employers" within the meaning of the ADA and ADEA.

12. At all times material, Plaintiff was an employee of Defendants.

13. Vengroff Williams and Second Look are extensively interrelated, have a centralized control of labor relations, share common management and are commonly owned.

14. Edward Jordan ("Jordan") and Robert Williams ("Williams") serve as executives of both Vengroff Williams and Second Look. Williams is the Chief Executive Officer of Vengroff Williams and Second Look, while Jordan is the President of Second Look and Director of Vengroff Williams.

15. As described herein, Jordan and Williams each exercised day-to-day supervision over Plaintiff and each had the authority to hire, fire or otherwise affect the terms and conditions of Plaintiff's employment. Jordan and Williams also committed the unlawful acts alleged herein.

16. Vengroff Williams and Second Look collectively hired Plaintiff.

17. While Plaintiff's direct employer was purportedly Second Look, Plaintiff's offer letter was sent first from Jordan, using a Second Look email address, to Williams' Vengroff Williams email address. The offer letter was then given to Plaintiff by Williams, using his Vengroff Williams' email address, copying Jordan and Lindsey Snow, an employee of Vengroff Williams in its human resources department.

18. Prior to commencing her employment with Defendants, Vengroff Williams conducted Plaintiff's pre-hire screening, ordering Plaintiff's pre-employment background check and a pre-employment drug test, on which Vengroff Williams was listed as her employer.

19. Vengroff Williams also handles all of Second Look's information technology needs. Upon commencing her employment with Defendants, an employee of Vengroff Williams contacted Plaintiff to provide her with a work computer at her home address.

20. Vengroff Williams additionally conducts human resources' functions for Second Look. Throughout her employment with Defendants, Vengroff Williams' human resources department regularly communicated with Plaintiff, including on such topics as her W-4, her final paycheck and her termination.

21. Indeed, the address for Second Look on Plaintiff's W-2 was a Sarasota, Florida address, where Vengroff Williams, not Second Look, is located.

22. At all times material, Plaintiff worked remotely for Defendants while living in North Carolina.

## MATERIAL FACTS

23. On or about February 9, 2021, Plaintiff interviewed with Recruiter Jeff Cohen ("Cohen"), Jordan, whose office was located in New York, and Williams, whose office was located in Florida, for a position in Defendants' Subrogation Sales Team.

24. During the call, Plaintiff informed Cohen, Jordan and Williams that she had no prior experience selling Subrogation Services but had extensive experience selling other services to large insurance companies nationwide. Jordan and Williams agreed emphatically that training would be provided, and Williams stated to Plaintiff multiple times that it would take a minimum of one year to learn the trade and specifically how Second Look handled Subrogation Services.

25. Based on Jordan and Williams assertions that training would be provided, Plaintiff continued to pursue the position.

26. On or about March 5, 2021, Defendants, through Williams sent Plaintiff an official offer letter for a position as a full-time Remote Senior Sales Executive, earning $150,000 annually plus 4% commission on sales. Williams also communicated the offer to Plaintiff by telephone.

27. On or about March 15, 2021, Plaintiff began working for Defendants as a full time Senior Sales Executive.

28. At all times material, Plaintiff worked under the supervision of Jordan and Williams.

29. At all times material, Plaintiff was qualified for her position given her extensive sales background and experience.

30. As a Senior Sales Executive, Plaintiff's position was focused on selling Subrogation Services to insurance companies. Additionally, Plaintiff's duties and responsibilities included communicating with new potential clients, creating PowerPoint sales presentations, email campaigns, and facilitating Webex meetings.

31. On or about March 23, 2021, Plaintiff received her only training with Defendants. Jordan called Plaintiff and briefly described the role over the phone and then sent Plaintiff a few outdated resources which were irrelevant to Plaintiff's position. Defendants offered no other trainings or assistance with Plaintiff's new role despite their previous promises of extensive training.

32. Nevertheless, throughout Plaintiff's tenure with Defendant, Plaintiff was an exemplary employee with no write-ups or disciplinary actions throughout her employment. In fact, Plaintiff's ideas and work were often praised by Management.

33. On or about April 7, 2021, Plaintiff took a sick day because Plaintiff was experiencing multiple symptoms of COVID-19 such as fever, shortness of breath, extreme fatigue, dehydration, chills, headache, severe cough, incontinence, and loss of smell and taste.

34. That same day, Plaintiff was tested, and the results were positive for COVID-19.

35. On or about April 8, 2021, Plaintiff called Williams and explained her positive COVID-19 results and severe symptoms. Williams screamed at Plaintiff, "Why didn't you get the vaccine?" Williams later emailed Plaintiff, to "take the rest of the week off and let [Williams] know when [Plaintiff] got back to work."

36. In the days that followed Plaintiff was very ill with COVID-19 and suffered from severe symptoms such as difficulty breathing, a painful cough, fatigue, fever, dehydration, incontinence and low oxygen levels. Plaintiff had difficulty walking, standing, communicating and could not get out of bed.

37. On or about April 12, 2021, Plaintiff's doctor recommended Plaintiff go to the Emergency Room for Monoclonal Antibodies IV Therapy. However, the Emergency Room denied Plaintiff the treatment stating Plaintiff had been too sick for an extended period of time, and therefore did not qualify for the treatment.

38. The following day, on or about April 13, 2021, Williams called Plaintiff and asked how she was feeling. When Plaintiff explained her symptoms, Williams screamed, "You should have gotten the vaccine!"

39. Later that day, at approximately 5:44 P.M., Jordan emailed Plaintiff stating, "when you are feeling up to it, give me a call." Plaintiff did not see the email until later that night and replied at 9:04 PM stating she would call the next day, and explaining she was still

experiencing severe symptoms. Plaintiff then emailed Williams and apologized for being out sick and promised to make up the time.

40. On or about April 14, 2021, Jordan called Plaintiff, asking when Plaintiff would return to work. Jordan then told Plaintiff his COVID-19 symptoms only lasted three days and asked for proof of Plaintiff's positive results.

41. Due to Jordan's hostile tone, and Jordan's insinuation that Plaintiff no longer had COVID-19, Plaintiff felt pressured to return to work and therefore stated she would try to return to work the following day.

42. That same day, per Jordan's demand, Plaintiff forwarded her positive LabCorp COVID-19 results to Jordan.

43. On or about Thursday, April 15, 2021, Plaintiff emailed Williams and requested further sick leave until Monday, April 19, 2021. Williams responded, telling Plaintiff to ask Jordan instead. Plaintiff then emailed Jordan the same request. Neither Williams nor Jordan replied to Plaintiff's request.

44. On or about April 19, 2021, Plaintiff returned to work, against Doctor's orders, while still experiencing severe symptoms such as difficulty breathing, low oxygen, chills, headaches, coughing, incontinence, fatigue, and diarrhea. Although Plaintiff was still extremely ill, Plaintiff returned to work for fear of losing her employment.

45. On or about April 19, 2021, Jordan emailed Plaintiff again demanding proof of COVID-19, and claiming the previous email was insufficient. Plaintiff replied explaining the positive test result and confirming that was the only document LabCorp provided. Plaintiff then contacted her doctor and provided a second letter from her doctor with the same LabCorp results previously provided confirming the positive results.

7

46. On or about April 21, 2021, Plaintiff continued to experience severe COVID-19 symptoms and was sent for further testing and blood work.

47. On or about April 23, 2021, Plaintiff's doctor contacted Plaintiff and informed her of possible blood clots in her lungs. Plaintiff's doctor then ordered a CT scan and further testing.

48. That same day, on or about April 23, 2021, during a call with Williams, Plaintiff informed Williams that she would need a CT scan to rule out possible blood clots in her lungs. Williams' only response was "when can you get the vaccine?"

49. On or about April 27, 2021, Plaintiff had a CT scan.

50. On or about April 28, 2021, Plaintiff's doctor informed her that the results of the CT scan indicated "patchy bilateral ground glass infiltrates, predominantly peripheral, nonspecific, consistent with COVID pneumonia." Plaintiff's doctor then diagnosed COVID-Pneumonia.

51. Plaintiff's COVID-19 and COVID-pneumonia diagnosis constituted a disability as they resulted in long-term difficulty in multiple major life activities such as walking, standing, bending, breathing, and communicating.

52. Despite Plaintiff's illness, Plaintiff remained able to perform the essential functions of her position and continued to work diligently for fear of losing her employment.

53. On or about April 29, 2021, Plaintiff informed Jordan and Williams of her diagnosis of COVID-pneumonia and ongoing symptoms but confirmed she would continue to work and would not take further sick leave.

54. Defendants did not ask Plaintiff how her disability was affecting her ability to perform her duties, nor did Defendants engage in an interactive process with Plaintiff regarding possible leave or accommodations that might help Plaintiff.

55. Instead, immediately after learning of Plaintiff's disability, Defendants began treating Plaintiff worse than similarly situated employees. For example, later that same day, Plaintiff was called into a meeting with Jordan and learned she was demoted. Williams then informed Plaintiff that Chris Tidball ("Tidball") was, effective immediately, the Sales Manager and Plaintiff's new direct Manager. This was in effect, a demotion for Plaintiff as Tidball was hired after Plaintiff, was Plaintiff's peer, and meant Plaintiff now responded to a third Manager.

56. Later that day, Williams called Plaintiff. Plaintiff expressed her gratitude for the call and noted Plaintiff's concerns that Jordan had not returned any of Plaintiff's calls or emails since she had returned to work ten (10) days earlier. In response, Williams only replied by asking "When are you getting the COVID vaccine?" Plaintiff replied that per her doctor's orders, she was unable to obtain the vaccine until she was fully recovered. Plaintiff then reminded Williams she was still experiencing chronic and severe symptoms. Williams was upset to hear Plaintiff would not be getting the vaccine anytime soon.

57. In the days that followed, Plaintiff was subjected to a hostile work environment as Defendants and its employees began to display animosity, speak to Plaintiff in an aggressive tone and ignore Plaintiff's calls and emails.

58. On or about April 30, 2021, Plaintiff emailed her new supervisor, informing him of her pneumonia diagnosis.

59. The next workday, on or about May 3, 2021, Tidball emailed Plaintiff and informed her that a Sales and Training meeting would occur in the New York office. Tidball further informed Plaintiff that she was expected to be in New York for the four-day event. Plaintiff requested a reasonable accommodation in the form of attending the meeting via Zoom as Plaintiff was unable to fly while with pneumonia. Tidball responded later in the day stating, "that should be ok."

60. On or about May 4, 2021, Defendants scheduled a sales meeting, and purposely did not send Plaintiff the dial in instructions. Plaintiff sent several requests to Tidball, Williams and Jordan but received no answer. Finally, Plaintiff was able to find login information and joined the meeting.

61. Once in the meeting, Williams asked Plaintiff how she was feeling. Then, in front of all her colleagues at the meeting, Williams told Plaintiff that Plaintiff was sick because "COVID-19 hits older people harder."

62. During that same meeting, Plaintiff asked a work-related question and Jordan replied, "when you come up to NY next week, I will sit you with different people." Therein Plaintiff realized her reasonable accommodation was denied.

63. Nevertheless, in face of said ridicule, which caused Plaintiff embarrassment and humiliation in front of her colleagues, Plaintiff continued to work and fulfill the essential functions of her job.

64. Then, two days after Plaintiff requested a reasonable accommodation, on or about May 5, 2021, Jordan called Plaintiff and informed Plaintiff her employment was terminated. In terminating Plaintiff, Jordan falsely claimed, "it's not working out, you can't stay here, you just don't get Subrogation no matter how many hours I spend training you." Plaintiff

responded by reminding Jordan that she was given only one training. Jordan disregarded Plaintiff and instead stated he would mail her labels to return the equipment.

65. On or about May 7, 2021, Plaintiff emailed Williams asking for severance pay and objecting to Defendants' discriminatory termination based on her disability. Williams did not reply.

66. Instead, later that same day, Defendants' Human Resources Representative emailed Plaintiff claiming Plaintiff was not terminated for being absent from work and claimed simply that North Carolina is an "at will employment state."

67. In the days that followed, Plaintiff sent multiple emails to Defendants asking to be paid for her final three days of work and asking Defendants to fill out the necessary unemployment paperwork in a timely manner.

68. Defendants retaliated against Defendants for objecting to the discriminatory termination by purposely delaying Plaintiff's final paycheck and purposely failing to provide the necessary unemployment paperwork.

69. Plaintiff was forced to send various follow up emails over the span of the following weeks in order to obtain her final paycheck and receive the necessary paperwork.

70. Plaintiff asked for a reasonable accommodation by asking to attend the New York meetings by Zoom as opposed to traveling with Pneumonia. This accommodation was reasonable and created no undue hardship for Defendants.

71. Plaintiff was terminated based on her disability as evidenced by Defendants' immediate demotion of Plaintiff after learning of her disability; Defendants' recurring questions regarding Plaintiff's vaccination status; and Defendants' hostile work environment. Further, once Defendants learned of Plaintiff's disability, Defendants purposely scheduled

a meeting in New York, knowing Plaintiff would be unable to fly while battling pneumonia. Then, Defendants terminated Plaintiff's employment merely two days after she requested a reasonable accommodation to attend the meeting via zoom as opposed to flying.

72. Further, Defendants failed to ask Plaintiff how her disability would affect her job performance, or to what extent her disability would impact her abilities to perform her duties. Defendants' refusal to participate in an interactive process with Plaintiff regarding reasonable accommodations is a violation of the law.

73. Defendants took adverse employment actions against Plaintiff by immediately demoting Plaintiff the same day Defendants learned of Plaintiff's disability, and by terminating Plaintiff's employment within two days of Plaintiff requesting a reasonable accommodation.

74. Defendants' actions and conduct were intentional and intended to harm Plaintiff.

75. As a result of Defendants' actions, Plaintiff feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

76. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, benefits and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff further experienced severe emotional and physical distress.

**FIRST CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER THE ADA**

77. Plaintiff repeats and realleges each and every allegation in paragraphs one through seventy-six.

78. Defendants violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336) (ADA), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

79. Title 42 of the Americans with Disabilities Act ("herein "ADA") of 1990, Chapter 126, Subchapter I, Section12112, Discrimination [Section 102] states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

80. Plaintiff's diagnosis of COVID-19 and COVID-pneumonia resulted in chronic fatigue, fever, shortness of breath, low oxygen levels, dizziness, coughing, incontinence, and gastro-intestinal problems. Further, Plaintiff's diagnosis qualifies as a disability as it had a negative long-term effect on multiple major life activities for Plaintiff such as walking, standing, bending, breathing, and communicating. Therefore, Plaintiff's disability is an impairment that substantially limits one or more of her major life activities within the meaning of § 12102(1)(A) of the ADA.

81. Plaintiff requested a reasonable accommodation due to her illness and disability. Specifically, Plaintiff requested to attend Defendants' New York meeting virtually via Zoom, as opposed to flying with pneumonia. Defendants claimed to approve the accommodation, but then terminated Plaintiff two days after requesting the reasonable accommodation for pretextual reasons. Later, when Plaintiff objected to the discriminatory termination based on her disability, Defendants replied stating "North Carolina is an at will employment state."

82. Defendants were aware of Plaintiff's disability and need for a reasonable accommodation.

83. Plaintiff is a qualified individual who could perform the essential functions of her employment with a reasonable accommodation as defined by § 12111(8) of the ADA.

84. Defendants failed to make a good faith effort to accommodate Plaintiff's disability. Further, Defendants failed to engage in an interactive process with Plaintiff regarding possible leave or accommodations that might help Plaintiff.

85. The accommodation that Plaintiff requested was reasonable and created no undue hardship for Defendants. Defendants failed to communicate with Plaintiff meaningfully and in good faith concerning Plaintiff's disability and requested accommodations.

86. Defendants discriminated against Plaintiff in violation of the ADA by refusing to accommodate Plaintiff's disability and instead terminated Plaintiff only six days after learning of her diagnosis, and only two days after learning of Plaintiff's need for a reasonable accommodation.

87. Defendants knowingly and intentionally discriminated against Plaintiff because of her disability and/or perceived disability.

88. Plaintiff was terminated based on her disability as evidenced by Defendants' immediate demotion of Plaintiff after learning of Plaintiff's disability; Defendants' recurring questions regarding a COVID-19 Vaccine; Defendants' animosity and hostile work environment; Defendants' disregard of Plaintiff's doctor's notes and refusal to accept her diagnosis; Defendants' unexpected meeting which required a multiple hour flight; and Defendants' termination of Plaintiff merely two days after Plaintiff requested a reasonable accommodation.

89. Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights under the ADA when it refused to provide a reasonable accommodation for her disability.

## SECOND CAUSE OF ACTION
## FOR RETALIATION UNDER THE ADA

90. Plaintiff repeats and realleges each and every allegation in paragraphs one through seventy-six.

91. The ADA prohibits retaliation, interference, coercion, or intimidation against an employee who engages in protected activity.

92. 42 U.S.C. § 12203 provides:

    Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

    Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

93. Plaintiff engaged in activities protected by the ADA by asking for a reasonable accommodation to avoid flying to New York while diagnosed with pneumonia. Further, Plaintiff engaged in protected activities when Plaintiff emailed the CEO, Williams, to object to the unjust and discriminatory termination based solely on Plaintiff's illness and disability.

94. Defendants retaliated against Plaintiff by terminating Plaintiff's employment merely two days after Plaintiff requested a reasonable accommodation. Further, Defendants retaliated against Plaintiff by unjustly and purposely delaying Plaintiff's final paycheck and by

15

failing to provide the necessary unemployment forms, all of which was done in retaliation to Plaintiff's objections. Plaintiff was then forced to send multiple follow-up emails over a two-week span in order to obtain her final paycheck and necessary unemployment paperwork.

95. Defendants would not have terminated Plaintiff but for Plaintiff's medical disability and need for a reasonable accommodation.

96. Defendants would not have delayed Plaintiff's final paycheck, and delayed Plaintiff's crucial unemployment papers but for Plaintiff's objection to a discriminatory and unjust termination.

97. As a direct result of Plaintiff's protected activities, Defendants retaliated against Plaintiff by terminating her employment and purposely delaying Plaintiff's final paycheck and unemployment paperwork.

98. Defendants' retaliatory conduct was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

99. Defendants' conduct was with malice or reckless indifference to Plaintiff's federally protected rights under the ADA.

### THIRD CAUSE OF ACTION
### FOR DISCRIMINATION UNDER THE ADEA

100. Plaintiff repeats and realleges each and every allegation in paragraphs one through seventy.

101. The Age Discrimination in Employment Act of 1967 (the "ADEA"), § 4(a), 29 U.S.C. § 629(a) provides that:

> It shall be unlawful for an employer:
> (1) To fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

> (2) To limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
>
> (3) To reduce the wage rate of any employee in order to comply with this chapter.

102. As described herein, Defendants discriminated against Plaintiff on the basis of her age (over forty years old) in violation of ADEA, by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, disparate treatment of Plaintiff based on her age.

103. As a result of Defendant's unlawful discriminatory conduct in violation of the ADEA, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

104. As a result of Defendants' unlawful discriminatory conduct in violation of ADEA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

## JURY DEMAND

105. Plaintiff requests a jury trial on all issues to be tried.

   **WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A. Declaring that Defendants participated in unlawful employment practices prohibited by the ADA and ADEA in that Defendants discriminated against Plaintiff on the basis of her disability and age;

B. Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination, and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action;

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

Dated: Garden City, New York
October 14, 2022

**PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC**

By: _____/s/_____
Marjorie Mesidor, Esq.
585 Stewart Avenue, Suite 430
Garden City, New York 11530
T: (212) 248-7431
F: (212) 901-2107
mmesidor@tpglaws.com