UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DEBORAH GREY,

    Plaintiff,

v.                                                 Case No: 8:23-cv-687-KKM-CPT

VENGROFF WILLIAMS, INC.,
and SECOND LOOK, INC.,

    Defendants.
_____

## ORDER

For about two months in 2021, Deborah Grey worked as a senior salesperson for Second Look, Inc., a company selling subrogation services. She spent two weeks of her brief tenure out of the office with COVID-19. Towards the end of her probationary period, she requested an accommodation for bilateral COVID pneumonia. Second Look granted that accommodation but terminated her a few days later, saying that she was not grasping her job and was difficult to work with. She then filed this lawsuit, claiming that Second Look and a related company, Vengroff Williams, Inc., discriminated against her based on a perceived disability—severe COVID-19—and her age in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12112, 12203, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623. The defendants now move for summary

judgment on all her claims. Because no reasonable jury could conclude that Grey's evidence tends to show that her employer's reasons for terminating her were pretextual, that motion is granted.

I. BACKGROUND

A. Second Look Hires Grey to Sell Subrogation Services

In early March 2021, Second Look hired Deborah Grey as a Senior Sales Executive to sell subrogation services. Joint Statement of Undisputed Facts (Doc. 59) ¶¶ 15, 33 (JSOF). She was 69 years old at the time. JSOF ¶ 12. Second Look's standard policy provides that new hires are subject to a sixty-day trial period that Second Look considers "a continuation of the employment selection process." *Id.* ¶ 25. While Grey had no prior experience in subrogation, Second Look provided her with extensive resources and support during that trial period to get her up to speed. *Id.* ¶¶ 5, 34–40. Grey reported to Edward Jordan, Second Look's president, through March and most of April, until Second Look promoted Christopher Tidball, another Senior Sales Executive, to Sales Manager. *Id.* ¶¶ 29–30. After that, Grey reported to Tidball. *Id.* ¶ 31.

Grey's time with Second Look got off to a rocky start. On April 1, she suggested to Jordan that she might need to "fudge" data in a prospective client presentation. Def.'s Statement of Material Facts (Doc. 60) ¶ 6 (DSOF);[1] (Doc. 59-5) at 136, 624–25. Jordan

---

[1] The case management scheduling order provides that "[a]ll material facts set forth by the moving party shall be deemed admitted unless controverted by the opposing party in the response to the motion for

2

immediately asked Grey to call him. DSOF ¶ 7; (Doc. 59-5) at 624. He interpreted her statement as a desire to fabricate statistics to make Second Look more favorable, and he said that he was concerned that Grey wanted to "falsify information" and told her that he "did not want that happening." (Doc. 59-3) at 77. Jordan brought this misstep to Second Look CEO Robert William's attention at the time, who saw it as an "ethical breach." DSOF ¶ 10; (Doc. 59-2) at 66–67.

### B. Grey Struggles with Work and COVID-19

In early April, Grey became sick with COVID-19. Her symptoms caused her to stop work on April 6, 2021. JSOF ¶ 41. Williams approved her request to take time off while she recovered, and she ultimately returned to work on April 19, almost two weeks later. *Id.* ¶¶ 43–44, 57, 59. She did not request any accommodations upon her return, and Second Look paid her for the time that she took off. *Id.* ¶¶ 62–64. After that, Grey continued to work while still suffering from the lingering effects of her COVID infection. *Id.* ¶ 75; DSOF ¶ 20; (Doc. 59-5) at 243. At some point following her diagnosis, Williams told Gray that an older person "suffer[s] worse than a younger person" when contracting COVID, a comment Gray understood as Williams expressing authentic concern for her. (Doc. 59-5) at 196–97.

---

summary judgment." (Doc. 58) at 3. The defendants' proffered facts are thus taken as undisputed to the extent the record supports them unless Grey disputes them in her response.

Upon her return and into early May, Grey attended regular weekly sales meeting with Williams, Jordan, Tidball, and another Second Look employee. JSOF ¶¶ 67–68. At these meetings, Grey was supposed to provide a short summary of what she had been working on in the past week and what she intended to do in the coming week. DSOF ¶ 27; (Doc. 59-6) at 91. Instead, Grey recounted a "litany" of activities—many of which "had absolutely nothing to do with sales." (Doc. 59-6) at 91. Tidball repeatedly counseled Grey to keep her presentations short and "sales-focused," but they remained long and revealed that Grey spent her time on activities that "did absolutely nothing for" Second Look. *Id.*

On May 3, Tidball reached out to Grey and others about planning a sales meeting in New York in the next two weeks. JSOF ¶ 71. Grey responded that her doctor had asked her not to travel because of her condition but proposed that she attend remotely. *Id.* ¶ 72. Tidball approved this request. *Id.* ¶¶ 73–74.

### C. Second Look Terminates Grey

The following day, Grey, Williams, Jordan, Tidball, and others all attended Second Look's weekly sales meeting. *Id.* ¶ 76. It did not go well. Grey "challenged" Tidball over his use of LinkedIn Navigator, a sales tool that she believed Second Look was unfairly providing to Tidball but not to her. DSOF ¶ 34; Doc. (59-5) at 292–93. In fact, Tidball paid for the software himself. DSOF ¶ 34; (Doc. 59-6) at 163. Williams said the meeting was "one of the more distressing ones that I've had to sit through." (Doc. 59-2) at 90.

Tidball described Grey's conduct as "belligerent" and "highly disrespectful." (Doc. 59-6) at 107, 163–64; *see* JSOF ¶ 79. Grey admitted that she "regret[s]" her actions in the meeting. (Doc. 59-5) at 292–93.

Second Look's leadership moved quickly after the sales meeting. Williams and Jordan decided to terminate Grey, with input from Tidball. JSOF ¶ 79. In Tidball's view, Grey was "on a track where she was not going to be successful" because her contacts were not relevant to the sales Second Look was trying to make, " 'her pipeline wasn't growing' and 'she was doing a lot of non-value-added tasks.' " *Id.* ¶ 80 (quoting (Doc. 59-6) at 103–04). Williams expressed concerns about Grey's work ethic, noting that in the sales meeting he saw that she sent only thirty-one outbound emails one week, which he equated with less than a day's work. (Doc. 59-2) at 97–98.[2] Jordan told Grey that she was terminated on May 5, 2021, the day after the sales meeting. JSOF ¶¶ 81–82. When asked by a Second Look human resources employee that evening why Jordan was terminating Grey, Jordan responded that she was "[n]ot grasping the [j]ob, was "unable to perform the tasks assigned," and was "reluctant to cooperate." (Doc. 65-1) at 39.

---

[2] Williams discovered that Grey had in fact sent only seven outbound emails that week only after Second Look terminated her. (Doc. 59-2) at 128.

### D. Grey Complains to Second Look While Second Look Hires a New Senior Sales Executive

Grey was shocked. JSOF ¶ 90. She emailed Williams to explain why she thought her termination was unwarranted. (Doc. 59-2) at 213. Grey told him that she could "only assume that the real reason I was terminated is due to my having Covid, followed by Covid induced pneumonia. Nothing else makes sense[.]" (Doc. 59-2) at 213. Williams in turn forwarded her email to human resources because he felt "that we are being set up for a discrimination lawsuit." (Doc. 59-2) at 219. Human resources responded on Williams's behalf, explaining to Grey that she was terminated in Second Look's sixty-day evaluative period, that she was an at-will employee, and that, in any event, "[a]ny absences [she] may have experienced during [her] employment had no bearing on this decision"—something Grey does not dispute. JSOF ¶¶ 92–93.

Shortly after firing Grey, Second Look hired a new Senior Sales Executive—fifty-nine-year-old Maryann Vitkievicz. JSOF ¶ 94–95. Vitkievicz performed a similar role to Grey but was responsible for exploring a new sector of the subrogation business, as well as building out Second Look's website and developing its promotional literature. (Doc. 59-2) at 118–19; (Doc. 59-3) at 59–60. Vitkievicz required very little training, started strong, and "built a decent [sales] pipeline" early on. (Doc. 59-6) at 127, 155, 157. Later in her tenure, though, she "stopped closing deals" and behaved inappropriately at a company conference, leading to her termination in late 2022. *Id.* at 154–55, 158.

Around that same time, Grey filed this employment discrimination action against Second Look and Vengroff Williams.[3] Compl. (Doc. 1). She claims that the defendants discriminated against her by terminating her because they regarded her as disabled in violation of the ADA (Count I),[4] retaliated against her for requesting a reasonable accommodation in violation of the ADA (Count II), and discriminated against her based on her age in violation of the ADEA (Count III). *Id.* ¶¶ 77–104. The defendants now move for summary judgment on all three counts.

## II.  LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant always bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate an absence

---

[3] Second Look was at one point a division of Vengroff Williams, and at all relevant times Second Look and Vengroff Williams shared some resources. JSOF ¶ 3; *see, e.g.*, (Doc. 59-2) at 219 (email from Vengroff Williams human resources to Grey regarding Grey's termination from Second Look). The defendants dispute that Vengroff Williams ever employed Grey but argue that even if it did, summary judgment is still appropriate. Def.'s Mot. for Summ. J. (Doc. 60) at 1 n.1. Because the parties' arguments do not distinguish between the two entities for purposes of summary judgment, neither do I.

[4] Grey's complaint lists multiple bases for her discrimination claim. *See* Compl. ¶¶ 84, 86, 88 (pointing to the defendants' failure to accommodate Grey as well as her termination and demotion). Grey now makes clear that she challenges only her termination. Pl.'s Resp. to Mot. for Summ. J. (Doc. 65) at 7 n.3.

7

of a genuine issue of material fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). When that burden is met, the burden shifts to the nonmovant to present evidentiary materials (e.g., affidavits, depositions, exhibits, etc.) demonstrating that there is a genuine issue of material fact, which precludes summary judgment. *Id.* A moving party is entitled to summary judgment if the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Court reviews the record evidence as identified by the parties and draws all legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020). Here, to the extent that the record is disputed or capable of multiple inferences, the Court draws them in favor of the non-movant.

To evaluate a summary judgment motion in a disability or age discrimination case, courts employ the standards developed for Title VII discrimination claims. *See Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1215 n.7 (11th Cir. 2021). A plaintiff must produce evidence that would allow a reasonable jury to conclude that she was discriminated against or retaliated against on a protected ground. *Id.* at 1214. When a plaintiff relies on circumstantial evidence, as Grey does here, a plaintiff can survive summary judgment by either succeeding in a burden shifting framework or presenting a "convincing mosaic" of evidence that supports an inference of discrimination. Under the first method, a plaintiff

8

must establish a prima facie case of discrimination or retaliation. *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). Once the plaintiff does so, the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason for the challenged action." *Id.* If the employer meets that "exceedingly light" burden, *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983), then the burden shifts back to the plaintiff to produce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer" were pretextual, *Wascura*, 257 F.3d at 1243 (quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)).

Alternatively, a plaintiff can survive summary judgment by presenting a "convincing mosaic" of "circumstantial evidence [that] raises a reasonable inference that the employer discriminated." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Relevant evidence may include "(1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Yelling*, 82 F.4th at 1342.

## III. ANALYSIS

Grey does not dispute that the defendants have articulated a legitimate, nondiscriminatory reason for her termination: that "Grey was 'terminated because of her lack of qualifications and inability to execute the basic requirements of her position, with

9

the final straw occurring when she was "highly disrespectful" towards her supervisor during a team meeting.' " Pl.'s Resp. to Mot. for Summ. J. (Doc. 65) at 15–16 (Resp.) (quoting Def.'s Mot. for Summ. J. (Doc. 60) at 1–2 (MSJ)). Assuming that she can meet her prima facie case for each claim,[5] Grey still must show that these reasons were pretextual. She can do so by offering evidence tending to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc)).

Grey points to three types of evidence she says support an inference of pretext: (1) the timing of Grey's termination; (2) the subjective and shifting nature of the termination reasons; and (3) "the more favorable treatment" of Vitkievicz, Grey's successor. This evidence does not raise an inference of pretext. Nor does the evidence create a

---

[5] The defendants vigorously dispute that Grey has made out this case as to her ADA claim. *See* MSJ at 12–19 (arguing that Grey was not disabled and that the defendants did not regard her as disabled). As I conclude that Grey cannot show that the reasons for her termination were pretextual, I need not decide whether she made out a prima facie case of disability discrimination, although I suspect not. Grey manifested ordinary symptoms attendant to COVID-19 and experienced them for less than a month before her termination. At best, Grey's evidence tends to show that, when the defendants terminated Grey, she had bilateral COVID pneumonia and that her condition would continue for some unknown period. *See* (Doc. 59-5) at 651. Because Grey argues that the defendants regarded her as disabled and the defendants respond that her condition was "transitory and minor," 42 U.S.C. § 12102(1)(C), MSJ at 14–15, she has the burden of producing some evidence that her condition did or was expected to persist for over six months, *see* 42 U.S.C. § 12102(3)(B); *see also EEOC v. STME, LLC*, 938 F.3d 1305, 1314 (11th Cir. 2019); *Booth v. GTE Fed. Credit Union*, No. 8:21-CV-1509-KKM-JSS, 2021 WL 5416690, at *3–6 (M.D. Fla. Nov. 20, 2021). Yet she points to no such evidence in her response.

"convincing mosaic" sufficient to allow a reasonable jury to find that the defendants discriminated against Grey.

### A. Timing Is Not Enough by Itself to Preclude Summary Judgment

Grey contends that the proximity between her request for an accommodation and the defendants' decision to terminate her supports an inference of pretext. Resp. at 17–18 (noting the closeness between Grey's request for accommodations on May 3[6] and her termination on May 5). While temporal proximity may help build an inference of pretext, it is not enough by itself for a discrimination claim to survive summary judgment. *See Yelling*, 82 F.4th at 1341 ("[T]iming alone is not enough to show pretext." (citing *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1137 n.15 (11th Cir. 2020) (en banc))); *Todd*, 998 F.3d at 1219–20. And the proximity between her request for an accommodation for a COVID-19-related illness and her termination does not support her age discrimination claim at all. In short, Grey's claim must rise or fall by her other reasons.

### B. The Defendants' Reasons for Terminating Grey Are Consistent With Each Other and with the Undisputed Record

Grey points to what she describes as the "subjective" and "shifting explanations" why Second Look terminated her. Grey argues that the absence of any documented discussions about terminating her prior to the May 4 meeting, compliments she received on her work,

---

[6] Grey says in her response that she requested her accommodation on May 4, 2021. Resp. at 18. But the record and the parties' Joint Statement both reflect that Grey made her request on May 3. *See* JSOF ¶¶ 72–73; (Doc. 59-5) at 223–24, 648–49.

approvals for travel, and the paucity of reasons given to human resources when she was terminated show that the reasons that the defendants point to now—her poor performance, poor fit for her role, insubordination, and dishonesty—are pretextual.

That the defendants' reasons for terminating Grey may have been subjective is not a reason for inferring pretext. Courts "are not in the business of adjudging whether employment decisions are prudent or fair." *Wascura*, 257 F.3d at 1247 (quoting *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)). And the pretext inquiry "centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). An employer's reasons for terminating an employee may be "subjective" or even idiosyncratic so long as they are not discriminatory.

Whether an employer gives inconsistent reasons for terminating an employee is more probative of whether reasons given are the real ones. *See Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1275 (11th Cir. 2017). Yet the reasons given by the defendants are not shifting or inconsistent with either each other or with the record.

To start, it is not surprising or suspicious that Grey's supervisors would discuss her future at the company immediately after a "disrespectful" "challenge" to her immediate supervisor in a meeting at which all three of her managers were present. (Doc. 59-5) at

292–93; (Doc. 59-6) at 107, 163–64. And while Grey may have received compliments on particular projects prior to her termination, the record does not reveal evidence suggesting that Grey's supervisors were satisfied with her overall performance in the leadup to the May 4 meeting shortly after her request for an accommodation. *See, e.g.*, (Doc. 59-5) at 622 (email from Williams to Grey on April 1, 2021, that read "Nice job on the brochure I like it").

Second Look's approval of Grey's business travel also does not undermine its proffered reasons for terminating her. For one, Second Look approved Grey's one business trip much earlier in her employment than she represents. *Compare* Resp. at 17–18 ("With Defendant's permission, Plaintiff even made reservations on April 27, 2021, to attend a sales conference in Amelia Island on September 11, 2021), *with* JSOF ¶ 45 (reporting that Grey booked the trip on April 9, while she was out with COVID), *and* (Doc. 59–5) at 630 (same). And even if the trip had been booked later, booking a single business trip does not cast doubt on an employer's belief that an employee was underperforming. *See Alvarez*, 610 F.3d at 1266 ("[T]he fact that [an employee] thinks more highly of her performance than her employer does is beside the point.").

Jordan's failure to expressly reference Grey's conduct at the May 4 meeting and her purported dishonesty in his email to human resources also does not cast doubt on the

defendants' reasons. After human resources asked why Second Look was terminating Grey, Jordan provided this brief explanation:

> Not grasping Job [sic], unable to perform the tasks assigned reluctant to cooperate.
>
> Thanks
> Ed

(Doc. 65-1) at 39. Putting aside the possibility that Grey's alleged dishonesty and insubordination might be captured within Jordan's terse response, "the existence of a[n] . . . additional non-discriminatory basis for [Grey's] termination does not . . . prove pretext." *Tidwell v. Carter Prod.*, 135 F.3d 1422, 1428 (11th Cir. 1998). Other evidence tends to show that these were contemporary concerns. Jordan testified that he brought Grey's dishonesty to Williams's attention after the May 4 meeting. (Doc. 59-3) at 78; *see also* (Doc. 59-2) at 101. And the parties agree that after the meeting Williams said to Jordan "that he was 'pretty unhappy with the meeting' including 'the tone.' " JSOF ¶ 77 (quoting (Doc. 59-2) at 101). Grey points to no evidence suggesting that Second Look's leadership did not have these concerns when she was terminated.

To address this issue, Grey repeatedly asserts that no reliance at all should be placed on Jordan's testimony about Grey's dishonesty or her conduct in the meeting immediately before her termination. Resp. at 19. This argument misapprehends the summary judgment standard. At summary judgment, the Court may not "weigh evidence or make credibility determinations." *Lewis v. City of Union City*, 934 F.3d 1169, 1179 (11th Cir. 2019). A

14

plaintiff cannot survive summary judgment simply by asking the Court to conclude that the defendants' witnesses are not credible.

Grey also suggests that Williams's forwarding of her post-termination email to HR with the observation that he thought "that [Second Look is] being set up for a discrimination lawsuit," (Doc. 59-2) at 219, is evidence of pretext, Resp. at 19. In her view, Williams had a guilty conscience and knew how the termination would look. But Williams's statement was in response to Grey's email saying that she could "only assume that the *real* reason she was terminated is due to . . . having Covid." (Doc. 59-2) at 219 (emphasis added). In the light of her email, Williams's concern that Grey might file a lawsuit was reasonable and is not evidence that the reasons for Grey's termination were pretextual.

Reaching for caselaw, Grey cites to *Prosser v. Thiele Kaolin Co.*, 135 F. Supp. 3d 1342 (M.D. Ga. 2015), and *Wile v. Financial Industry Regulatory Authority, Inc.*, No. 14-80218-CIV, 2014 WL 7238170 (S.D. Fla. Dec. 17, 2014). Grey cites *Prosser* for the proposition that a subjective account of a party's attitude is an issue that should be resolved by a jury. Resp. at 19–20. But in *Prosser* the parties disputed the plaintiff's attitude, while here Grey does not dispute her conduct during the meeting. *See* 135 F. Supp. 3d at 1359. As for *Wile*, Grey argues that it teaches that close proximity between a protected action (filing a complaint, in that case) and termination creates an issue of fact as to whether the

15

protected action accelerated the timeline for termination even if termination would have occurred anyway. Resp. at 21–22. In *Wile*, the employer decided to eliminate a long-time employee's position a mere hour after the employee filed an internal complaint. 2014 WL 728170, at *8. That is a far cry from this case, in which the termination decision came several days after an accommodation had been *granted* and Grey, a recent hire, had behaved in a way that caused her supervisors to reevaluate her future at the company. These cases do not help Grey.

The defendants' explanations for why Grey was terminated are consistent with each other and the record. They do not support an inference that the defendants' reasons were pretextual.

### C. The Evidence Does Not Support Grey's Contention that Defendants Treated Vitkievicz More Favorably

Finally, Grey points to her successor, Vitkievicz. She contends that like her, Vitkievicz made few sales during her first few months with Second Look. Unlike her, though, Second Look left Vitkievicz in her role for over a year and did not fire her until she became drunk at a company event. Resp. at 22–23. Also unlike her, Grey says, Vitkievicz's supervisors met with her over fifty times to encourage her to improve her performance. *Id.* On Grey's view, this disparate treatment of a similarly situated, younger successor not suffering from COVID-19 is evidence that Second Look terminated Grey on a protected basis.

16

This argument is not support by the record. The undisputed testimony is that while Vitkievicz was hired into the same Senior Sales Executive role that Grey had, Vitkievicz's focus was different and she had additional duties. Vitkievicz was responsible for building out Second Look's website, developing promotional materials, and exploring a new angle in the subrogation business. (Doc. 59-2) at 118–19; (Doc. 59-3) at 59–60. What is more, Second Look leadership testified that Vitkievicz developed a much better sales pipeline than Grey early on, even if neither closed any deals during their probationary period. *Compare* (Doc. 59-6) at 155 (describing Vitkievicz as a "good starter" who "built a decent pipeline"), *with* JSOF ¶ 80 (observing that Grey's "pipeline wasn't growing" and that she was not "on a track where she was going to be successful" (quoting (Doc. 59-6) at 103–04)). As for the fifty meetings that Vitkievicz's supervisors had with her, these were ordinary weekly sales meetings like the one that was the catalyst for Grey's termination. *See* (Doc. 66) at 10–11.

Neither the defendants' explanations for Grey's termination nor their treatment of Vitkievicz support an inference that the reasons for Grey's termination were pretextual. By itself, the proximity between her (granted) request for accommodation and her termination do not create a jury question on the issue of pretext. For the same reasons, Grey has not presented a "convincing mosaic" that would allow a reasonable jury to conclude that defendants discriminated against her. Summary judgment is thus appropriate.

17

IV. CONCLUSION

Because Grey has neither presented evidence that would allow a reasonable jury to infer that her termination was pretextual nor created a convincing mosaic supporting an inference of discrimination, the defendants are entitled to summary judgment. Accordingly, the following is **ORDERED:**

1. Defendants' Motion for Summary Judgment (Doc. 60) is **GRANTED**. The Clerk is directed to enter **JUDGMENT** in favor of Defendants Vengroff Williams, Inc. and Second Look, Inc.

2. The Clerk is directed to terminate any pending motions and deadlines, and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on November 5, 2024.

*Kathryn Kimball Mizelle*
Kathryn Kimball Mizelle
United States District Judge

18